769 F.2d 1503
 38 Fair Empl.Prac.Cas. 1364,
38 Empl. Prac. Dec. P 35,534, 54 USLW 2167
 Barbara J. EATMON, et al., Plaintiffs-Appellees,
v.
BRISTOL STEEL & IRON WORKS, INC., Defendant-Appellant.
Barbara J. EATMON, et al., Plaintiffs-Appellants, Cross-Appellees,
v.
BRISTOL STEEL & IRON WORKS, INC., Defendant-Appellee,
Cross-Appellant.
Barbara J. EATMON, et al., Plaintiffs-Appellees,
v.
BRISTOL STEEL & IRON WORKS, INC., Defendant-Appellant.
 Nos. 84-7282, 84-7347 and 84-7476.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 3, 1985.
 
 J. Scott Vowell, Richard A. Meelheim, Birmingham, Ala., for Bristol Steel & Iron Works, Inc.
 Robert L. Wiggins, Jr., Birmingham, Ala., for Barbara J. Eatmon, et al.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before RONEY and HILL, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 Appellant/defendant Bristol Steel and Iron Works, Inc. ("Bristol") appeals a district court order finding that Bristol breached a conciliation agreement between itself and the Office of Federal Contract Compliance of the Department of Labor ("OFCC"). The order awarded back pay and attorney's fees to the appellees/plaintiffs, one former female applicant and fourteen former female employees of Bristol Steel. The appellees cross-appeal the district court's denial of their claim for front pay. We affirm the district court's order, except with regard to the denial of front pay and the award of attorney's fees to appellee Vernita Oates. These portions of the order are reversed. The case is remanded for a determination of the front pay claim in a manner consistent with this opinion.
 
 I. FACTS
 
 2
 In a 1980 routine compliance review of employment conditions at Bristol, which is a government contractor, the OFCC discovered that Bristol had no restroom facilities for women in its plant. The OFCC also learned that Bristol had refused to hire the fifteen appellees and seven other women who had applied for jobs in May of 1979, but had hired several men. The OFCC advised Bristol that it was in violation of Executive Order 11246, which requires government contractors to be equal opportunity employers.[1] In October 1980, Bristol and the OFCC entered into a conciliation agreement to rectify the situation. That agreement (hereinafter referred to as the "executive order conciliation agreement") provided, in relevant part, that Bristol would pay approximately $4,000.00 in back pay to each of the twenty-two persons identified in the document as members of the "affected class." The fifteen appellees were among the persons expressly named in the document as members of "the affected class." The agreement also had provisions relating to "rightful place" and "front pay," stating that "Bristol Steel Company will provide 'front pay' to compensate the affected class for economic losses that they will continue to suffer between the date of execution of the Conciliation Agreement and the date they (individually) attain their rightful place."
 
 
 3
 Bristol sent notices to the appellees and the other seven women identified in the executive order conciliation agreement, indicating they should contact the company if they were still interested in employment. The appellees did contact Bristol, and Bristol employed fourteen of them beginning in November and December 1980 and January 1981. One of the appellees, Vernita Oates, was not employed because she did not have the necessary physical capabilities.[2]
 
 
 4
 The fourteen appellees who were hired were told about some of the provisions of the executive order conciliation agreement but were never shown a copy of the agreement. Under the agreement, Bristol was obligated to explain fully to the affected class their rights under the agreement, including those of back pay. The plaintiffs were informed that the amount of back pay provided for in the agreement was in the range of $4100, but that Bristol was seeking approval for a reduction in the amounts based on earnings that the women had received during the period of May 1979 until the dates of their employment by Bristol.
 
 
 5
 In late February 1981, the employed appellees executed releases in which they accepted the benefits provided to them under the executive order conciliation agreement as a waiver and release of claims for employment discrimination relating to the delay in their employment. In this regard, each employed appellee expressly agreed in the release "not to institute a lawsuit or a charge under Title VII of the Civil Rights Act...." Vernita Oates did not sign a release.
 
 
 6
 After signing the releases, the employed appellees received checks for the gross amount of $1,311.42 (less appropriate withholdings), which was basically the original back pay amount of about $4000 less the earnings they had received between May 1979 and the date they began working for Bristol. Prior to receipt of those checks, they had not been told that the back pay would be of that amount, or, indeed, of any amount less than $4,000. Appellee Vernita Oates was not given any back pay.
 
 
 7
 In September of 1981, the work force at Bristol was reduced because of general economic conditions. Bristol based the appellees' seniority dates on their actual dates of employment rather than the dates of their initial applications in May 1979. Thus, pursuant to a collective bargaining agreement between Bristol and the union, appellees were laid off prior to the time that men who had been employed by Bristol during May 1979 until November 1980 were laid off.
 
 
 8
 All the appellees, except Ms. Oates, filed charges with the OFCC on September 15, 1981 and the EEOC on December 14, 1981. After the EEOC issued a right to sue letter, they filed suit in the United States District Court for the Northern District of Alabama, alleging that Bristol had violated Title VII of the Civil Rights Act of 1964 and the executive order conciliation agreement by, among other things, failing: (1) to provide them with seniority retroactive to the date of their initial 1979 applications; (2) to pay them the back pay amounts provided for in the conciliation agreement; and (3) to pay them front pay.[3]
 
 
 9
 Prior to, and at trial, appellant/defendant Bristol Steel argued that the district court lacked subject matter jurisdiction. The district court held that it had jurisdiction, stating,
 
 
 10
 I think the jurisdiction of the Court is grounded in the jurisdiction of the Court to enforce agreements between the OFCCP and employer.... I think that is the number one. Number two, Title VII of course allows jurisdiction over certain charges. Ordinarily, those where there has been a charge filed with the EEOC, although the courts have also said that there is an ancillary jurisdiction of the Court to enforce Title VII settlement agreements independently of any assertion of a complaint. Apparently, there is also a question as to whether the Court would have diversity jurisdiction.
 
 
 11
 Trial Record, vol. 3, at 18.
 
 
 12
 At trial, the district court held for the appellees on the issue of back pay, but against them on their claims for retroactive seniority and front pay. With respect to back pay, the court determined that the conciliation agreement was unambiguous and thus not subject to a different interpretation through consideration of extrinsic evidence. According to the court, "[t]hat agreement clearly ... called for twenty-two persons listed in ... that agreement to be paid amounts listed in that agreement...." Trial Record, vol. 4, at 66. The court thus did not permit Bristol to introduce evidence showing that Bristol and OFCC had agreed that Bristol would pay only those actually employed and that the amount of back pay would be reduced on the basis of interim earnings. The district court also determined that the releases signed by the appellees had no effect on the back pay provisions of the executive order conciliation agreement. It held that Bristol had breached the back pay provisions of the agreement.
 
 
 13
 The court determined the appellees were not entitled to retroactive seniority since the conciliation agreement did not mention such a benefit and appellees knew when they signed the releases that their seniority dated only from the time of their actual employment, and not from the denial of their original applications.
 
 
 14
 The court denied the appellees' claim for front pay, stating that the conciliation agreement was not "sufficiently clear with respect to imposing upon the company any obligation under the labeling of rightful place or front pay for its inability to provide seniority for purposes of layoff going back to date of application." Trial Record, vol. 4, at 70.
 
 
 15
 The court awarded back pay and attorney's fees to all appellees.
 
 II. ISSUES
 
 16
 Bristol Steel's appeal and appellees' cross-appeal raise basically the following four issues:[4]
 
 
 17
 1. Whether the federal courts have subject matter jurisdiction over this case.
 
 
 18
 2. Whether the district court correctly determined that appellees were entitled to back pay.
 
 
 19
 3. Whether the district court correctly determined that appellees were not entitled to front pay.
 
 
 20
 4. Whether the district court erred in awarding attorney's fees to appellees.
 
 III. JURISDICTION
 
 21
 Initially, it is necessary to clarify the nature of appellees' claims against Bristol. Their complaint, as amended, states basically two categories of claims. The first is a typical Title VII employment discrimination claim, in which they allege Bristol discriminated against them on the basis of sex when it refused to credit them with retroactive seniority back to the date of their initial applications, and refused to train, recruit, hire and promote female employees. With regard to this claim, appellant Bristol Steel maintains that federal jurisdiction could not be grounded in Title VII, since appellees did not file charges with the EEOC within 180 days of these alleged discriminatory acts, as required by 42 U.S.C. Sec. 2000e-5(e). E.g., United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before ... [Title VII] was passed. It ... has no present legal consequences"). Appellees do not contest appellant's assertion.
 
 
 22
 We are, of course, mindful of the Supreme Court's decision in Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982), holding that filing a timely charge with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that like a statute of limitations is subject to waiver, estoppel, and equitable tolling. It would appear that, under Zipes, there would be federal jurisdiction of appellees' first category of claims. However, it also appears that this claim might be time-barred since appellant did raise, as a defense, appellees' failure to file timely charges with the EEOC. In any event, the district court never ruled on this first category of claims, resting its judgment exclusively on appellees' second category of claims. It is thus on that category of claims that our jurisdictional inquiry focuses.
 
 
 23
 The second category of claims made in appellees' complaint is grounded on the executive order conciliation agreement. Appellees alleged that Bristol breached the terms of this agreement, and they sought enforcement of those terms. They based their cause of action, apparently, on: (1) their status as actual parties to the releases, in which they agreed not to bring any Title VII claims based on their delay in being hired and Bristol agreed to give them the benefits provided them in the executive order conciliation agreement; and (2) their status as third-party beneficiaries to the executive order conciliation agreement.
 
 
 24
 We hold that there is federal subject matter jurisdiction over appellees' second category of claims, which, essentially, seeks enforcement of the releases and the executive order conciliation agreement. That jurisdiction is conferred by Title VII, and by 28 U.S.C. Sec. 1331, which governs federal question jurisdiction.[5]
 
 A. Title VII Jurisdiction
 
 25
 Section 706(f)(3) of Title VII provides, in relevant part, that "[e]ach United States district court ... shall have jurisdiction of actions brought under this subchapter [i.e., Title VII] " (emphasis added). A typical action "brought under" Title VII is one in which an employee sues his or her employer for the latter's discriminatory practices. It is with respect to such actions that, as noted above, charges typically must be timely filed with the EEOC. However, the courts have recognized that suits brought by the EEOC to enforce "Title VII conciliation agreements" entered into by the EEOC, the employer and the affected employees also are suits "brought under" Title VII, over which federal courts have subject matter jurisdiction. With respect to these suits, charges need not be filed with the EEOC within 180 days of the alleged breach of the agreement. Administrative remedies need not be exhausted. The EEOC can go directly to court to enforce such agreements, as soon as it believes the agreement has been breached. E.g., E.E.O.C. v. Safeway Stores, Inc., 714 F.2d 567 (5th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984); E.E.O.C. v. Liberty Trucking Co., 695 F.2d 1038 (7th Cir.1982). Following this line of authority, we hold that the releases signed by the employed appellees, in which they agreed not to bring charges under Title VII in return for Bristol Steel's compliance with the executive order conciliation agreement, are themselves "Title VII conciliation agreements," and that appellees' suit, which, in essence, seeks to enforce the terms of the releases, is an "action[ ] brought under" Title VII. Appellees need not have filed charges with the EEOC within 180 days of the alleged breaches in order to bring this action "under" Title VII.
 
 
 26
 To understand what has been meant by the term "Title VII conciliation agreement" in the context of Safeway Stores, Liberty Trucking Co., and the other cases that have established the rule of law stated above, it is necessary to describe the statutory framework governing Title VII. Typically, an employee who believes he has been discriminated against by his employer and wants to do something about it must file charges with the EEOC. When a charge against an employer is filed, the Commission is required to serve notice on the employer and investigate the charge. If, after investigation, the EEOC determines there is not reasonable cause to believe the allegations are true, it must dismiss the charge and notify all parties. If the EEOC determines there is reasonable cause, it must initially attempt to eliminate the alleged unlawful employment practice through conciliation and persuasion. 42 U.S.C. Sec. 2000e-5(b). Should the EEOC not secure an acceptable conciliation agreement from the employer within thirty days after the charge is filed, it may bring a Title VII action against the employer in a United States District Court. Id. Sec. 2000e-5(f)(1).
 
 
 27
 In Safeway Stores and Liberty Trucking, the EEOC had found reasonable cause to believe that charges filed by employees were true, and had attempted to rectify the situations through conciliation. In these cases, conciliation agreements were, in fact, entered into by the EEOC, the employers and the affected employees. The employers, subsequently, breached these agreements. The EEOC then filed suit in federal district court to enforce the conciliation agreements. The employers argued that under the express terms of Title VII the only action the EEOC can take when conciliation fails is to bring a civil action against the employer to litigate the underlying claims of discrimination, and that the EEOC can not enforce conciliation agreements in federal court.
 
 
 28
 The courts rejected this position, determining that even though Title VII did not explicitly provide the EEOC with authority to seek enforcement of conciliation agreements in federal courts, Congress must have intended to provide the EEOC with a federal forum. The courts noted that Title VII has been and is to be interpreted in a manner that places emphasis on its remedial purposes, and that "a hyper-technical construction of Title VII is inappropriate." Liberty Trucking Co., 695 F.2d at 1040. See, e.g., Zipes, 455 U.S. at 397, 102 S.Ct. at 1134. The courts concluded that the emphasis in Title VII on conciliation and the legislative history of Title VII indicate that Congress intended Title VII to be enforced primarily through conciliation and voluntary compliance. Cf. Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) ("Cooperation and voluntary compliance were selected as the preferred means for achieving this goal"). The courts determined it would be antithetical to Congress' strong commitment to conciliation if there were no federal forum for enforcement of conciliation agreements.
 
 
 29
 The releases involved in the instant case certainly take on the same conciliatory spirit as the Title VII conciliation agreements involved in Safeway and Liberty Trucking. As the Seventh Circuit explained in Liberty Trucking, 695 F.2d at 1041-42,
 
 
 30
 Conciliation agreements are voluntary contracts containing terms upon which the employer, the employee, and the EEOC agree. Nothing in the legislation compels either of these parties to reach final agreement.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 [Conciliation Agreements] often contain elaborate prospective remedial requirements including reinstatement and promises to employ.... [I]n return for the employers' promises, both the EEOC and the employees waive their rights to sue with respect to the matters alleged in the EEOC charge.
 
 
 34
 The releases fit the above description in most respects: (1) they were entered into voluntarily;[6] and (2) the appellees promised not to sue under Title VII in return for the benefits provided under the conciliation agreement.[7]
 
 
 35
 Of course, the instant situation does differ from that in Safeway and Liberty Trucking in two respects: (1) the suit for enforcement is brought by employees, not the EEOC; and (2) appellees never filed charges with the EEOC concerning the underlying discriminatory practice that prompted creation of the releases (i.e. the refusal to hire the appellees),[8] thus the EEOC never conducted any investigation, determined reasonable cause, nor participated in any way in the creation of the release.
 
 
 36
 That this action for enforcement is brought by employees, not the EEOC, does not, by itself, prevent this from being an action "brought under" Title VII. All of the reasons that support Title VII jurisdiction over such actions when brought by the EEOC apply with equal force to actions brought by the aggrieved employees to enforce conciliation agreements entered into by the EEOC, their employer and themselves. Accord Kiper v. Louisiana State Board of Elementary Education, 592 F.Supp. 1343, 1359 (M.D.La.1984). The congressional goal of enforcing Title VII through conciliation and voluntary compliance would be hampered if employees could not seek to enforce in federal courts conciliation agreements between themselves, their employers and the EEOC. We note that the Tenth Circuit has permitted employees to bring such actions in federal court, see Brito v. Zia Co., 478 F.2d 1200 (10th Cir.1973), and that our circuit has previously suggested as much, albeit in dicta, see Kirby v. Dole, 736 F.2d 661, 664 (11th Cir.1984).
 
 
 37
 Further, the facts that no charges were ever filed with the EEOC, and there was no EEOC investigation or determination of reasonable cause do not prevent this from being an action "brought under" Title VII. A case particularly instructive in this regard is E.E.O.C. v. Henry Beck Co., 729 F.2d 301 (4th Cir.1984), where, though EEOC charges had been filed and the EEOC was a party to the agreement, no EEOC investigation or determination of reasonable cause preceded the agreement.
 
 
 38
 Henry Beck involved what is called a "pre-determination settlement agreement." As the court explained in Henry Beck, such agreements are
 
 
 39
 reached pursuant to the Commission's 'Rapid Charge Processing System' adopted in 1977. This system, which is designed to encourage pre-investigation stipulations and settlements, was the Commission's response to an increasing backlog of charges resulting from time consuming investigations. The new system has had considerable success in increasing the percentage of claims settled and in reducing the number of investigations needed.
 
 
 40
 The Commission's regulations reflect the changes in post-filing procedures brought about by the Rapid Charge Processing System. Specifically, 29 C.F.R. Sec. 1601.20 provides that '[p]rior to the issuance of a determination as to reasonable cause the Commission may encourage the parties to settle the charge on terms that are mutually agreeable.... The Commission shall limit its undertaking in such settlements to an agreement not to process that charge further....'
 
 
 41
 Id. at 303.
 
 
 42
 The Fourth Circuit held that suits seeking to enforce these pre-determination settlement agreements are "brought under" Title VII since they are no less effective in serving the congressional goal of conciliation and voluntary compliance than are the traditional conciliation agreements:
 
 
 43
 By allowing more frequent settlements, the PDS saves resources that might otherwise be consumed in litigation and furthers the statutory goal of voluntary compliance. In addition, it enhances the aim of rapidly resolving disputes by encouraging early resolution before the Commission is required to expend time in investigations and reasonable cause determinations.
 
 
 44
 Id. at 305. The court concluded that " '[to] prohibit the EEOC from summarily enforcing pre-determination settlements would allow employers to engage in dilatory tactics which would frustrate the congressional intent of rapid resolution of disputes.' " Id. at 306 (quoting E.E.O.C. v. Cleveland State University, 28 FEP Cases 441, 444 (N.D.Ohio 1982)).[9]
 
 
 45
 The only differences between the instant case and Henry Beck were that here no EEOC charges were filed and the EEOC was not a party to the agreement. In short, while in Henry Beck, EEOC participation was minimal, here it was nonexistent. But, as Henry Beck teaches, the crucial factor to Title VII jurisdiction over these types of cases is not EEOC participation. It is furtherance of the congressional goal of conciliation and voluntary compliance with Title VII. The releases entered into here, even absent EEOC participation, certainly serve and further this goal. Cf. Air Lines Stewards and Stewardesses Association v. American Airlines, Inc., 455 F.2d 101 (7th Cir.1972) (court held that an agreement between employees and their employer settling the former's Title VII lawsuit against the latter was acceptable, even though objected to by the EEOC, because, inter alia, it reflected the voluntary agreement of the parties and voluntary agreements are especially important to Title VII, and because the real party in interest in conciliation endeavors is not the EEOC, but the employee alleged to have been discriminatorily treated). Like the pre-determination settlement agreement in Henry Beck, the releases "save[ ] [EEOC] resources" and "enhance[ ] the aim of rapidly resolving disputes by encouraging early resolution before the Commission is required to expend time in investigations and reasonable cause determinations." Henry Beck Co., 729 F.2d at 305.
 
 
 46
 Failure to permit these agreements to be enforced in federal court under Title VII could frustrate the congressional goal of compliance through conciliation. For example, state courts might be hostile to certain terms typically included in these agreements, such as specific performance clauses. See 81 C.J.S. Specific Performance Sec. 96 (1977) (Supp.1982). Cf. Liberty Trucking Co., 695 F.2d at 1043 ("State court enforcement of conciliation agreements is problematical. Provisions which uniformly appear in EEOC conciliation agreements would be subject to the variance and uncertainty of fifty different state court interpretations.... Additional problems may arise from the fact that many state courts are hostile to specific performance clauses in employment contracts").
 
 
 47
 Further, failure to permit enforcement in federal court might well encourage employers to abide the conciliation agreement until the 180-day period for filing charges with the EEOC passes and then breach the agreement. By that time, it would be too late to file any charges regarding the employer's underlying discriminatory act, which had led to the agreements. Even if late filing of charges is permitted for reasons of equity, the employee would still be prejudiced since the EEOC investigation would have been substantially delayed. Crucial witnesses might no longer be available or not remember the incident, and vital written evidence might have been disposed of. Thus, in the end, the employee, if not permitted to enforce the agreement in federal court, might be without any remedy. It was for this reason, among others, that the courts determined that the lack of a federal forum for enforcement of conciliation agreements would frustrate the goal of conciliation and voluntary compliance. As the court explained in Safeway Stores, Inc., 714 F.2d at 573:
 
 
 48
 Were we to accept Safeway's position, an employer would be free to enter into a conciliation agreement, bide its time for so long as it benefited from doing so, and then breach the agreement with no fear of sanction. The employer would have lost nothing. It would then face only the same prospect of suit on the underlying discrimination charge it would have faced prior to its entering the conciliation agreement. The EEOC and the aggrieved employees, on the other hand, would have suffered serious prejudice. The suit would be possible only after the Commission learned an employer or a union would not fulfill its obligations. Suit undertaking to prove discrimination would have been substantially delayed. Such delay would potentially result in difficulty in proving violations of the Act. Witnesses might no longer be available, memories would have faded, and crucial documents might not have been preserved. Conciliation, instead of being a means of enforcing the law, could well become a dilatory tactic which could be used to make enforcement of Title VII less effective.
 
 
 49
 Cf. George Banta Co. v. N.L.R.B., 604 F.2d 830, 838 (4th Cir.1979), cert. denied, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) (upheld enforcement of settlements under NLRA, stating "[t]o permit a party to accept the benefits of a settlement agreement, and then withdraw from that agreement without complying with its corresponding obligations, would subvert the settlement process").
 
 
 50
 For all of these reasons, we conclude that appellees' action to enforce the release is one "brought under" Title VII, and thus the district court had subject matter jurisdiction under Title VII.[10]
 
 
 51
 B. 28 U.S.C. Sec. 1331: Federal Question Jurisdiction
 
 
 52
 Our holding above, that there is subject matter jurisdiction over appellees' claim seeking enforcement of the releases, does not establish subject matter jurisdiction over the claim of Vernita Oates, the one appellee who did not sign a release. Ms. Oates' claim, seeking enforcement of the executive order conciliation agreement, can be based only on her status as a third-party beneficiary of that agreement between Bristol and the OFCC.[11] The question here is whether federal courts have jurisdiction over such a claim. We hold that they do by virtue of section 1331.
 
 
 53
 We begin by discussing the provisions of executive order 11246 and the administrative scheme established to implement it. With the necessary background information thus provided, we explain our reasons for finding section 1331 jurisdiction.
 
 1. Executive Order 11246
 
 54
 Executive Order 11246 requires all federal government contracts to include an equal opportunity clause forbidding employment discrimination on the basis of race, color, religion, sex or national origin. Federal contractors also must agree to take affirmative action to ensure nondiscriminatory hiring and treatment of their employees.
 
 
 55
 Executive Order 11246 establishes a plethora of administrative procedures and remedies. See Exec. Order No. 11246, Secs. 205-212; 41 C.F.R. 60-1.1 to 1.34. Responsibility for administration of the order is on the Secretary of Labor. Exec. Order No. 11246, Sec. 201. The Secretary has, in turn, delegated his authority and responsibilities under the order to the Director of the OFCC. 41 C.F.R. Sec. 60-1.2. The OFCC can investigate employment practices of any government contractor and can receive and investigate complaints by employees or prospective employees. Exec. Order No. 11246, Sec. 206(a), (b). Where there is a substantial or material violation of the antidiscrimination and affirmative action provisions, the OFCC Director can recommend to the Justice Department that appropriate proceedings be brought to enforce those provisions including the seeking of injunctive relief, and can recommend to the EEOC that appropriate proceedings be instituted under Title VII. Id. Sec. 209(a)(2), (3). Additionally, the OFCC can cancel, terminate, or suspend any contract for failure of the contractor to comply with the nondiscrimination provisions and can blacklist noncomplying contractors under certain circumstances. Id. Sec. 209(a)(5), (6). However, before these various actions are initiated, the federal contracting agency must make reasonable efforts to secure compliance by means of conference, conciliation, meditation, and persuasion. Id. Sec. 209(b). It is only after exhausting administrative efforts to obtain compliance that the OFCC can seek to secure compliance through the courts. Thus, the primary mechanism used by the OFCC to enforce the executive order is the creation of conciliation agreements, such as the one between the OFCC and Bristol.
 
 2. 28 U.S.C. Sec. 1331
 
 56
 Section 1331 provides that "district courts shall have original jurisdiction of all civil actions arising under the constitution, laws or treaties of the United States." Executive Order 11246, which was issued by the president pursuant to statutory authority, has the force and effect of a statute enacted by Congress. United States v. New Orleans Public Service, Inc., 553 F.2d 459, 465 (5th Cir.1977), vacated and remanded on other grounds, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), proposition cited for reaff'd on subsequent appeal sub nom. United States v. Mississippi Power & Light Co., 638 F.2d 899, 904-06 (5th Cir.1981), cert. denied, 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1981); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632 (5th Cir.1967), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967) (involving Executive Order 10925, the predecessor provision to executive order 11246). Thus, there is no doubt that Ms. Oates (and the other appellees) would have an action "arising under federal law" for purposes of section 1331 if executive order 11246 provided a private cause of action for employees identified as beneficiaries in executive order conciliation agreements to enforce the agreements. This is very unlikely, however, since courts have repeatedly held that executive order 11246 does not create a private cause of action for employees to enforce the equal opportunity clause in their employers' government contracts. Cohen v. Illinois Institute of Technology, 524 F.2d 818, 822 n. 4 (7th Cir.1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); Weise v. Syracuse University, 522 F.2d 397, 411 n. 23 (2d Cir.1975); Traylor v. Safeway Stores, Inc., 402 F.Supp. 871 (N.D.Cal.1975). See also Farkas, 375 F.2d at 632-33 (involving executive order 10925, which was predecessor provision to executive order 11246 and was similar to present order in all relevant respects); Farmer v. Philadelphia Electric Co., 329 F.2d 3 (3d Cir.1964) (involving executive order 10925).[12] Though we doubt appellees have a private cause of action under the executive order, we need not decide that issue, since we hold there is federal subject matter jurisdiction even absent a private cause of action under the executive order.[13]
 
 
 57
 Even if they do not have a cause of action under the executive order, appellees, who were identified expressly in the executive order conciliation agreement as persons upon whom certain benefits were to be conferred, still have a cause of action based on their rights as intended third-party beneficiaries of the conciliation agreement. See 2 Williston on Contracts Sec. 356, at 823-29 (3d ed. 1959) and cases cited therein. This is not to say that employees not named in the conciliation agreement, or any employees or applicants other than appellees, are intended third-party beneficiaries. We hold only that under the facts of this case these appellees, who were expressly named in the agreement, are intended third-party beneficiaries.[14]
 
 
 58
 Of course, both the right and the remedy of appellees' contract action are created by state law. Thus, typically, their claim could not be brought in federal court, unless federal jurisdiction could be based on diversity of citizenship, which seems unlikely here. However, this case, unlike the typical contract case, "arise[s] under federal law," for purposes of section 1331 federal jurisdiction, since federal law controls the enforcement and interpretation of the executive order conciliation agreement.
 
 
 59
 Federal law controls since the executive order conciliation agreement was entered into pursuant to authority conferred by federal statute and the rights of the parties to the agreement derive essentially from a federal source. In United States v. Seckinger, 397 U.S. 203, 209-10, 90 S.Ct. 880, 884-85, 25 L.Ed.2d 224 (1970), the federal courts were called upon to interpret a provision in a government contract with a private contractor. The court explained that the provision had been included in the government contract pursuant to 40 U.S.C. Secs. 471-535, which provide for the procurement, management and disposal of government property. Because the contract was thus entered into pursuant to authority conferred by federal statute, the Supreme Court held that federal law governed interpretation of the contract. Similarly, here, executive order 11246, which requires government contractors to include an equal opportunity clause in their contracts and directs the OFCC to enter executive order conciliation agreements, has been found to be authorized by 40 U.S.C. Sec. 486(a), Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159, 170 (3d Cir.1971), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); Farkas, 375 F.2d at 632 n. 1 (involving executive order 10925), and Title VII, New Orleans Public Service, Inc., 553 F.2d at 466-68.
 
 
 60
 In Fulgence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir.1981), the court held that federal common law, rather than Louisiana state law, determined the validity of oral agreements settling Title VII lawsuits, explaining,
 
 
 61
 Since this case deals with the operation of a Congressional statutory scheme, the federal courts are competent to determine whether a settlement exists without resort to state law.... Creation of a federal rule rather than absorption of a state rule is appropriate where, as here, the rights of the litigants and the operative legal policies derive from a federal source. No significant state interest would be served by absorbing state law as the rule of decision governing Title VII settlement agreements. On the other hand, Louisiana's requirement that settlement agreements be reduced to writing might hamper a significant federal interest, since Congress has mandated a policy of encouraging voluntary settlement of Title VII claims.
 
 
 62
 Accord Lyles v. Commercial Lovelace Motor Freight, Inc., 684 F.2d 501 (7th Cir.1982). See also Maynard v. Durham & Southern Railway Co., 365 U.S. 160, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961) (federal law determines validity of releases under Federal Employers' Liability Act); Strange v. Gulf & South American Steamship Co., 495 F.2d 1235 (5th Cir.1974) (federal law determines validity of oral settlement agreements within federal courts' admiralty and maritime jurisdiction).
 
 
 63
 The instant case, like Fulgence, involves the operation of a federal scheme, authorized by Congress. Here, too, "the rights of the litigants and the operative legal policies derive from a federal source." To hold that state law controls the interpretation and enforcement of these agreements may frustrate the federal interest in ensuring that federal contractors are equal opportunity employers. For example, as noted earlier, the laws of many states do not favor specific performance clauses in employment contracts. However, this is typically included in executive order conciliation agreements as a means of ensuring the employer complies with his promise to be an equal opportunity employer. Thus, just as in Fulgence, application of state law would serve no state interest, while application of state law may well harm federal interests.
 
 
 64
 Since federal law controls the enforcement and construction of executive order conciliation agreements, resolution of appellees' cause of action, based on their status as third-party beneficiaries of the agreement, will require interpretation and application of federal law. Thus, even though the right and the remedy of appellees' cause of action are created by state law, their cause of action, nonetheless, "arise[s] under federal law" for purposes of section 1331. See Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); Smith v. Kansas City Title Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921); Ivy Broadcasting Co. v. American Telegraph & Telephone Co., 391 F.2d 486 (2d Cir.1968).
 
 IV. BACK PAY
 
 65
 Appellant argues the court erred in not admitting parol evidence that the parties actually intended that interim earnings would be deducted from the back pay awards and that no back pay would be given to class members not hired. We reject appellant's argument since the conciliation agreement was unambiguous with respect to back pay. Nor was there any lack of completeness or integration on the face of the agreement. Indeed, the agreement contained a "full statement" paragraph that stated it was "full, complete, and final." Absent such ambiguity or uncompleteness, parol evidence is not admissible and the court is restricted to the agreement itself, which, in this case, clearly provides for all the appellants, including those not hired, to receive approximately $4,000 in back pay. Roberts v. St. Regis Paper Co., 653 F.2d 166, 171 (5th Cir.1981); High v. Braniff Airways, Inc., 592 F.2d 1330, 1333 (5th Cir.1979).
 
 
 66
 Appellant also argues that appellees' instant attempt to enforce the executive order conciliation agreement is barred because they accepted back pay checks in the amount of $1,311.42, which they have not returned. Bristol relies on Ledbetter v. Frosty Morn Meats, 274 Ala. 491, 150 So.2d 365 (1963), which held that under Alabama law a condition precedent of contesting the validity of a release is the return of consideration paid for it. As noted above, federal common law, not state law, governs enforcement of the conciliation agreement. But, even assuming we were to adopt the Alabama rule as the federal rule, appellees' claim would not be barred. Appellees do not contest the validity of the releases. Indeed, they rely on the validity of the releases to argue that their terms respecting back pay and front pay were not met.V. FRONT PAY
 
 
 67
 On cross-appeal, appellees challenge only the district court's holding that under the executive order conciliation agreement they were not entitled to front pay. We agree that the district court erred.
 
 
 68
 Appellees claimed entitlement to "front pay" for (1) delay in being employed by Bristol between the date of the conciliation agreement and the date they actually began working for Bristol (hereinafter referred to as "Claim 1"); (2) delay in being paid at the rate they would have been paid had they been hired in May 1979 (hereinafter referred to as "Claim 2") and (3) premature layoffs caused by Bristol's nonrecognition of application date seniority (hereinafter referred to as "Claim 3").[15] The district court ignored claims 1 and 2 completely, and concluded with respect to claim 3, that the executive order conciliation agreement was not "sufficiently clear with respect to imposing upon the company any obligation under the labeling of rightful place or front pay for its inability to provide seniority for purposes of layoff going back to date of application." Trial Record, vol. 4, at 70.
 
 
 69
 A contract's meaning is to be determined by its language, without resort to extrinsic considerations, unless the language is ambiguous. Kimbell Foods, Inc. v. Republic National Bank, 557 F.2d 491, 496 (5th Cir.1977), aff'd sub nom. United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Our review of the district court's interpretation of the language of the executive order conciliation agreement is not restricted by the clearly erroneous rule of F.R.Civ.P. 52(a). We are to interpret the language "afresh" as a matter of law. See Eaton v. Courtaulds of North America, Inc., 578 F.2d 87, 90 (5th Cir.1978).
 
 
 70
 The conciliation agreement provides that "Bristol Steel Company will provide 'front pay' to compensate the affected class of applicants for economic losses that they will continue to suffer between the date of execution of the Conciliation Agreement and the date they (individually) attain their rightful place." "Economic losses" are defined to include "all monetary compensation including incentive pay, bonuses, pensions, fringe benefits, and interest." "Rightful place" is defined as "the position they [i.e., affected class members] would have held if hired on or shortly thereafter the date of their application." Cf. James v. Stockham Valves & Fittings Co., 559 F.2d 310, 358 (5th Cir.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978) ("In 'front pay' relief, a monetary award is calculated to terminate on the date a victim of discrimination attains an opportunity to move to his 'rightful place' rather than on the date the order granting relief is entered").
 
 
 71
 The terms of the agreement clearly provide that Bristol is to pay appellees for "economic losses" they suffered between the date of the conciliation agreement and the date they achieved the position they would have achieved if hired on their initial application dates. This clearly includes losses incurred because of the premature lay-offs. The district court erred, as a matter of law, when it found the conciliation agreement to be ambiguous with respect to claim 3. Appellees are entitled to front pay on the basis of that claim. However, the agreement is ambiguous with respect to the rate at which the amount of front pay owed is to be computed. The agreement provides that "[f]ront pay will be based upon the rate of pay for entry level jobs or Job Group 5." This could mean that whenever front pay is owed it is to be computed at the rate of pay for entry level jobs. Or, given the emphasis on "rightful place" in the front pay provisions, it could mean that computation of front pay may take into account standard salary increases and promotions, but these computations are to be made on the basis that the appellees would have started working for the company at entry level pay. Nothing in the agreement helps to clear up this ambiguity. Having not found the same ambiguity we do here, the district court made no findings, based on extrinsic evidence, on this issue of fact regarding the parties' intent. We thus remand this case to the district court for resolution of this question. If further proceedings are needed in this regard, the court may conduct them.
 
 
 72
 In regard to claim 1, about which the district court was completely silent, we find that the agreement clearly provided for front pay. However, here, too, the agreement is ambiguous with respect to the rate at which the amount of front pay owed is to be computed. Thus, this claim also is remanded for clarification of the ambiguity.
 
 
 73
 Finally, the agreement is ambiguous with respect to claim 2, once again because of the provision regarding the rate at which front pay is to be calculated. If all front pay payments are to be at the rate of entry level pay, then the agreement does not entitle appellees to the front pay demanded in claim 2. If the alternate interpretation of that clause is adopted, then appellees are entitled. Thus, this claim too is remanded for clarification of the ambiguity.[16]
 
 VI. ATTORNEY'S FEES
 
 74
 Appellant challenges the authority of the district court to award attorney's fees. The court awarded attorney's fees pursuant to Section 706(k) of Title VII which provides that a district court may award attorney's fees to the prevailing party in any action or proceeding under Title VII. As noted earlier in this opinion, this action by the employed appellees was one to enforce the terms of a Title VII conciliation agreement, and, as such, is brought under Title VII. Given that conciliation agreements such as that entered into by appellees serve the conciliation goals of Title VII, as well as save the resources and energies of the EEOC, it is appropriate to award attorney's fees pursuant to section 706(k) in such actions. Cf. Smith v. La Cote Basque, 519 F.Supp. 663 (S.D.N.Y.1981) (held plaintiff entitled to attorney's fees under section 706(k) for proceedings brought to enforce a settlement of a Title VII lawsuit). We thus affirm the award of attorney's fees to all appellees, except Ms. Oates, the one appellee who did not sign a release.
 
 
 75
 Ms. Oates' claim was not brought under Title VII, and thus she cannot be awarded attorneys' fees pursuant to that statute. Nor do any of the other bases asserted in appellees' motion for attorney's fees support an award of attorney's fees for her. She is not entitled to attorney's fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, nor any common law exceptions to the general rule that the prevailing litigant is not entitled to attorney's fees from opponents. See F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129-30, 94 S.Ct. 2157, 2165-66, 40 L.Ed.2d 703 (1974). See also Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).
 
 CONCLUSION
 
 76
 For the foregoing reasons, we affirm the district court's order, except with regard to the denial of front pay and the award of attorney's fees to appellee Vernita Oates. These portions of the order are reversed. The case is remanded for a determination of the front pay claim in a manner consistent with this opinion.
 
 
 77
 AFFIRMED in part; REVERSED in part; and REMANDED for proceedings consistent with this opinion.
 
 
 
 [1]
 Executive Order 11246, as originally issued, prohibited federal contractors from discriminating on the basis of race, color, creed or national origin. It did not include discrimination on the basis of sex. It was amended by Executive Order 11375 to include sex. When we refer to Executive Order 11246 in this opinion, we mean Executive Order 11246 as amended by Executive Order 11375
 
 
 [2]
 Ms. Oates does not challenge this employment decision. Her complaint is based solely on Bristol's failure to pay her the back pay provided in the conciliation agreement
 
 
 [3]
 Vernita Oates sought back pay only
 
 
 [4]
 Appellant also raises the question of whether appellees have a cause of action. We have no doubt that they do, and thus find no need to discuss the question separately. The nature of appellees' claims is discussed fully in the course of our discussion of the first issue involving subject matter jurisdiction
 
 
 [5]
 We refuse to base federal jurisdiction over this second category of claims on the doctrine of pendent jurisdiction, though, it would appear, as noted above, that there was federal jurisdiction over appellees' first category of claims. We refuse for two reasons. First, it is not clear to us from the record that both categories of claims arise from a common nucleus of operative facts. The first category of claims, unlike the second, does not rely in any way on the interpretation of the releases or the back pay, front pay or rightful place provisions of the executive order conciliation agreement. Second, the court became aware of the Zipes decision through its own research. Zipes was not discussed or mentioned by the parties, and the court never asked the parties to comment upon its affect on their arguments. We are not willing to base our decision on a line of reasoning upon which counsel have not commented, when there are alternative bases upon which counsel have said their piece
 
 
 [6]
 We note that appellant claims it did not enter "voluntarily" into the executive order conciliation agreement between itself and the OFCC. However, appellant does not suggest that it did not enter into the releases voluntarily, and the record would not support such a finding
 
 
 [7]
 Appellant seeks to distinguish the present releases from Title VII conciliation agreements on the ground that appellees did not actually waive any Title VII rights in the releases. According to appellant, the appellees, at the time they signed the releases in February 1981, could not have filed a Title VII action against Bristol for Bristol's failure to hire them in May 1979, because they had not filed charges with the EEOC within 180 days of that alleged discriminatory act. Any action was time-barred, claims the appellant. Thus, the promises made by appellees not to bring Title VII actions against appellant for its failure to hire them were empty promises
 Appellant itself drew up the releases and made them a settlement of Title VII claims. Under such circumstances, we refuse to hear appellant claim no Title VII rights were waived therein. We also note that it is not at all clear from the record that appellees could not have filed timely charges under a continuing violation theory. See, e.g., Gonzalez v. Firestone Tire & Rubber Co., 610 F.2d 241, 249 (5th Cir.1980). But, in any event, we will not listen to appellant insist no Title VII rights were waived when appellant itself drafted a contract that contemplated relinquishment of such rights and specifically bargained for such waiver.
 
 
 [8]
 Failure to file these charges about the underlying discriminatory practice is to be distinguished from failure to file a charge regarding the breach of a Title VII conciliation agreement. As noted previously, there is no need for the filing of timely charges with regard to the breach of a Title VII conciliation agreement; such agreements can be enforced in federal court in the absence of any charges. The question here is whether an agreement between an employer and employee concerning Title VII rights is a Title VII conciliation agreement, where the employee never filed charges in regard to the alleged underlying discriminatory practice that led to the creation of the agreement. In other words, appellees need not have filed timely charges with regard to Bristol's alleged breach of the releases (e.g., failure to pay back pay and front pay), as long as this is an action to enforce a Title VII conciliation agreement. The question is whether appellees' failure to file charges with the EEOC regarding Bristol's refusal to hire them prevents the releases from being Title VII conciliation agreements
 
 
 [9]
 The Fourth Circuit in Henry Beck Co., 729 F.2d at 305, distinguished the case from E.E.O.C. v. Pierce Packing Co., 669 F.2d 605 (9th Cir.1982), in which the Ninth Circuit held there was no federal jurisdiction under Title VII to enforce these pre-determination settlement agreements:
 In EEOC v. Pierce Packing Co., 669 F.2d 605 (9th Cir.1982), rehearing denied June 9, 1982 (decided before Liberty Trucking or Safeway Stores ), the Ninth Circuit held that although the Commission could resolve charges through a PDS, the regulation allowing such resolutions "does not permit court involvement predicated on breach of a settlement agreement, absent reasonable cause determination and good faith attempts at conciliation." 669 F.2d at 608. The court distinguished conciliation agreements from the PDS by noting that the former followed investigation, determination of reasonable cause and attempts at conciliation. The court held that Sec. 706(f)(3) was insufficient to sustain jurisdiction because to so hold would allow the Commission to use PDS agreements to "leapfrog" jurisdictional requirements when Title VII violations were charged.
 Although the court in Pierce Packing framed its holding in broad terms, the facts of that case distinguish it from the situation now under consideration. In Pierce Packing, Pierce settled by agreeing to post job vacancies, let women bid on jobs, transfer seniority for women who switched jobs, and implement an affirmative action program. Two years later, the Commission conducted a compliance review finding continued sex discrimination. Specifically, the review revealed sex segregated departments and job classifications with resulting pay disparity and discriminatory layoff policy. 669 F.2d at 606. The Commission then filed a complaint alleging that Pierce intentionally engaged in unlawful employment practices in violation of Title VII. 669 F.2d at 607. Thus, in Pierce Packing the Commission did try to "leapfrog" the jurisdictional prerequisites of Sec. 706(f)(1). Although on appeal in Pierce Packing, the Commission may have argued in the alternative for specific enforcement, see 669 F.2d at 608, the complaint which was dismissed did not so limit itself.
 In contrast, the Commission in this case seeks enforcement of a specific agreement without any ruling on the underlying charge of intentional employment discrimination. The damages sought arise from the breach of the agreement rather than from a generalized employment discrimination charge, and unlike the Commission's complaint in Pierce Packing, the complaint below does not seek to change Beck's general hiring or promotion practices. In a case such as the one before us, there is no reason to distinguish PDS agreements from conciliation agreements. Both promote the statutory goal of voluntary compliance and neither subverts other provisions of Title VII.
 * * *
 We hold that where an employer allegedly breaches a pre-determination settlement agreement after voluntarily entering into it, and the Commission seeks enforcement of that agreement only, without attempting to litigate the underlying unfair employment practice charge, the suit is brought directly under Title VII, and the United States District Courts have jurisdiction under Sec. 706(f)(3).
 Even if Pierce can, as the Fourth Circuit suggests, be limited to its particular facts involving "leapfrogging," our holding may, under the facts of this case, put us in conflict with the Ninth Circuit. In any event, we do not find any relevant distinction between pre-determination agreements and conciliation agreements for purposes of Title VII jurisdiction, given the congressional emphasis on voluntary compliance and conciliation. We are bolstered in our conviction by the fact that Pierce was decided prior to Liberty Trucking or Safeway Stores. We also note that the Seventh Circuit suggested in Liberty Trucking, 695 F.2d at 1044 n. 7, that it too would see no relevant difference for jurisdictional purposes, stating,
 We do not reach the question whether a distinction should be made between conciliation agreements, which are statutory creatures and which follow EEOC investigation and determination of reasonable cause, and settlement agreements which are a device created by the EEOC to resolve complaints prior to investigation. See EEOC v. Pierce Packing Co., 669 F.2d 605 (9th Cir.1982). We note, however, that our decision here turns on the voluntary nature of conciliation agreements and not upon an administrative finding of reasonable cause. Jurisdiction predicated upon the administrative finding of reasonable cause would, it appears tend to convert the EEOC into an adjudicative administrative agency.
 
 
 [10]
 We are bolstered in this conclusion by the dicta found in Kirby v. Dole, 736 F.2d 661 (11th Cir.1984). In Kirby, an employee filed a complaint with the EEOC for age discrimination. The employee and employer reached an agreement resolving the employee's age discrimination claims immediately prior to commencement of a hearing before the EEOC. The EEOC apparently was not a party to this agreement. When the employer allegedly breached the agreement, the employee reinstated his complaint with the EEOC for further processing from the point at which processing ceased when the agreement was entered. The employee also filed an action in district court seeking to enforce the settlement agreement. The eleventh circuit affirmed the district court's order granting summary judgment in favor of the defendant on the ground that one who settles his claim cannot subsequently seek both benefit of the settlement and opportunity to continue to press the claim he agreed to settle. In so holding, the court, citing Liberty Trucking, suggested that the employee might have chosen otherwise than reinstating his complaint:
 Without reinstating his complaint, appellant might have chosen to file suit in federal court, seeking an appropriate remedy for the government's breach. Cf. EEOC v. Liberty Trucking Company, 695 F.2d 1038, 1041 (7th Cir.1982) (federal court had jurisdiction over action brought by EEOC seeking enforcement of conciliation agreement resolving Title VII claim); Fulgence v. J. Ray McDermott & Company, 662 F.2d 1207, 1209 (5th Cir.1981) (per curiam) (nonbinding) (federal law determines validity of oral settlement agreements in employment discrimination actions brought pursuant to Title VII).
 Kirby, 736 F.2d at 664.
 
 
 [11]
 Of course, the other appellees could, and do, also claim their status as third-party beneficiaries as a basis for relief
 
 
 [12]
 The courts refused to imply such a cause of action because employees had an administrative remedy for their employers' noncompliance, since the executive order and implementing regulations permit them to file complaints with the OFCC and direct the OFCC to investigate them. Courts also determined that to imply a private cause of action under Executive Order 11246 would be disruptive of the administrative scheme established by the order and its implementing regulations, since the scheme requires conciliatory attempts by the OFCC before going to court. A private cause of action under the executive order would disrupt this by permitting court action prior to any conciliatory attempts. Thus, the courts held that aggrieved employees must file complaints with the OFCC; they cannot go directly to court
 Of course, these cases involved the initial contract between the government and the contractor; they did not involve executive order conciliation agreements. Nevertheless, given the reason for not implying a cause of action, it may well be that there is no implied cause of action under the circumstances of the instant case either. The regulations issued under the executive order provide certain administrative steps to be followed when an executive order conciliation agreement is allegedly breached:
 Sec. 60-1.34 Violation of a conciliation agreement or letter of commitment.
 (a) When a conciliation agreement has been violated, the following procedures are applicable:
 (1) A written notice shall be sent to the contractor setting forth the violations alleged and summarizing the supporting evidence. The contractor shall have 15 days from receipt of the notice to respond, except in those cases in which such a delay would result in irreparable injury to the employment rights of affected employees or applicants.
 (2) During the 15-day period the contractor may demonstrate in writing that it has not violated its commitments.
 (3) If the contractor is unable to demonstrate that it has not violated its commitments, or if the complaint alleges irreparable injury, enforcement proceedings may be initiated immediately without issuing a show cause notice or proceeding through any other requirement contained in this chapter.
 Thus, it can be said that beneficiaries of an executive order conciliation agreement are not without a remedy if its terms are breached, and that to imply a cause of action for them under the statute might disrupt the administrative scheme.
 
 
 [13]
 We observe that judicial refusal to imply a private right of action under executive order 11246 does not mean that private enforcement of that executive order, or agreements entered into pursuant to it, never may be obtained through a lawsuit. In Jones v. Local 520, International Union of Operating Engineers, 603 F.2d 664 (7th Cir.1979), cert. denied, 444 U.S. 1017, 100 S.Ct. 669, 62 L.Ed.2d 647 (1980), the Seventh Circuit held that an employee could sue under 42 U.S.C. Sec. 1981 to enforce an 11246 contract establishing preferential minority hiring. The court found that so long as the complaint stated the essential elements of a section 1981 claim, an employee could maintain an action to enforce 11246. See also Langland v. Vanderbilt University, 589 F.Supp. 995, 1016 n. 61 (M.D.Tenn.1984); Manuel v. International Harvester Co., 502 F.Supp. 45, 48 (N.D.Ill.1980)
 
 
 [14]
 Despite appellant's assertions to the contrary, we find no conflict between our position here and the former fifth circuit's position in Farkas, 375 F.2d 629 (5th Cir.1967), which implied that the employee in Farkas was not an intended third-party beneficiary. The Farkas employee, among other things, was not expressly named in the contract
 
 
 [15]
 Appellees articulated these claims in their complaint and in closing argument to the court. Evidence was introduced as to the amounts of money they would be entitled to under these claims
 
 
 [16]
 We note that the district court suggests several times in the record that the appellees, based on their knowledge of the terms of the conciliation agreement, may have waived certain of their rights as third-party beneficiaries to the agreement when they signed the releases. Thus, for example, the court suggests that since appellees were aware at the time they signed the releases they were not entitled to retroactive seniority they would have waived this entitlement by signing the releases even if the benefit had been conferred on them by the agreement. Trial Record, vol. 4, at 68-71. We do not find the court's analysis here very useful, at least in regard to the front pay claim, and thus it is not to be applied on remand. Even if appellees, at the time they signed the releases, were not aware that they had the right to front pay under the conciliation agreement and so, according to the district court, waived their rights to front pay, they would still be entitled to front pay, albeit on the basis of another theory. The executive order conciliation agreement expressly provides, "Bristol Steel Company will guarantee that all class members are fully aware of their rights under the Conciliation Agreement including their right to back pay, plus the prevailing interest rate, and front pay, if required, and any conditions of such payments; and the procedures through which those rights will be affected." Thus, if appellees were not aware of their rights to front pay when they signed the release and so somehow waived these rights, they could still sue Bristol, as third-party beneficiaries, for breach of the above provision in the conciliation agreement. Damages would certainly include the front pay they surrendered on account of Bristol's failure to comply with this provision and inform appellees of their rights to front pay